2006 VT 97

### State of Vermont v. Henry J. Hance, Jr.

[910 A.2d 874]

No. 06-255

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed September 8, 2006

*Marc D. Brierre*, Rutland County Deputy State's Attorney, Rutland, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Henry Hinton* and *Kelly Green*, Appellate Attorneys, Montpelier, for Defendant-Appellant.

¶ 1. **Skoglund, J.** Defendant Henry J. Hance, Jr. appeals the bail imposed by the district court. The court required defendant to post $60,000 in cash without an option to have that amount guaranteed by a third-party surety. While a cash-only bail is arguably authorized by 13 V.S.A. § 7554(a)(1)(F), defendant claims that the statute conflicts with Chapter II, § 40 of the Vermont Constitution. That section provides that "[a]ll persons shall be bailable by sufficient sureties."[1] We agree that, to the extent § 7554(a)(1)(F) permits imposition of cash-only bail, it violates our Constitution. Accordingly, we reverse and remand for further proceedings.

## I.

¶ 2. The following facts are undisputed. Defendant is charged with the felonies of Driving Under the Influence of Intoxicants (DUI), 23 V.S.A. § 1201, 8th Offense, *id.* § 1210, and Possession of Cocaine in an amount of 2.5 grams or more, 18 V.S.A. §§ 4205, 4231(a)(2), and the misdemeanor of Driving with License Suspended. 23 V.S.A. § 674. Defendant fled to South Carolina in late 2005 prior to his arraignment on these charges, leaving his mother and a teenage son behind in Vermont. Defendant avoided capture for several months before being arrested in South Carolina. After his arrest, defendant refused to waive extradition or return to Vermont until he learned that an application for a governor's warrant under 13 V.S.A. § 4962 was pending before the Governor. Defendant returned to Vermont and was arraigned on May 11, 2006.

¶ 3. At arraignment, defendant did not oppose the State's request for cash bail in the amount of $60,000, but reserved the right to file for modification of bail. Defendant moved to review bail, seeking to modify the cash bail requirement to permit defendant to post 10% of the $60,000 in cash and the remainder with sufficient sureties. The State opposed defendant's request. Defendant argued that the impo-

---

[1] Because the appeal presents a constitutional issue of first impression, it has been referred to the full Court pursuant to 13 V.S.A. § 7556(b).

sition of a cash-only bail violated his rights under Chapter II, § 40 of the Vermont Constitution.

¶ 4. At the bail review hearing, defendant's mother testified that, while she was willing and able to post 10% surety with her property as a guarantee, she could not post $60,000 in cash. The trial court found "ample evidence" to conclude that defendant was a flight risk and that there were "sufficient facts to justify . . . cash bail." In so holding, the trial court considered defendant's significant history of criminal convictions. Defendant has been convicted of DUI eight times since 1987, five times in Vermont, twice in New York, and once in Pennsylvania. Defendant's multiple DUI convictions led the Vermont Commissioner of Motor Vehicles to suspend his license for life in 1994. 23 V.S.A. § 1208(b). Defendant has been convicted five times on drug charges since 1988. Defendant's history includes two assault convictions, including one for aggravated assault. His criminal record also contains convictions for car theft, arson, breaking and entering, grand larceny, and four parole violations.

¶ 5. In imposing bail, the court noted defendant's long criminal record and expressed particular concern about defendant's prior failure to appear, including his flight to South Carolina and five-month absence there. Citing 13 V.S.A. § 7554(a)(1)(C), (D),[2] the court concluded that it had the authority to impose a cash-only condition, noting that the Vermont bail statutes refer to "cash or surety." The court made no finding that the 10% cash and the house offered to secure defendant's appearance was insufficient or unsatisfactory. The court was careful, however, to tell defendant that cash "bail is not being imposed to ensure your incarceration, Mr. Hance. It is being imposed to ensure your appearance . . . ." The court denied defendant's motion to modify the $60,000 cash bail requirement. Defendant filed a timely notice of appeal.

## II.

¶ 6. On appeal, defendant argues that the trial court's $60,000 cash-only bail condition violates Chapter II, § 40 of the Vermont Constitution, which provides that "[a]ll persons shall be bailable by sufficient

---

[2] The district court apparently did not note the renumbering and amendment of § 7554 in 2002. It is clear, nonetheless, that the court concluded that the statute authorized cash-only bail.

sureties."[3] Defendant asserts that the order imposing cash-only bail must be reversed and that he should be released upon posting 10% of the bail amount.[4] The State counters that 13 V.S.A. § 7554(a)(1)(F) explicitly permits the district court to impose cash-only bail. Ordinarily, we review a district court's decision regarding the type and amount of bail for abuse of discretion. *State v. Turnbaugh*, 174 Vt. 532, 534-35, 811 A.2d 662, 666 (2002) (mem.). Here, however, we must determine whether cash-only bail, as permitted by § 7554(a)(1)(F), is constitutional under Chapter II, § 40. For this task, our review is de novo. *State v. Roya*, 167 Vt. 594, 595, 708 A.2d 908, 909 (1998) (mem.). Further, "[w]hen considering the constitutionality of a statute we begin by presuming that the legislative enactment is constitutional." *Glidden v. Conley*, 2003 VT 12, ¶ 11, 175 Vt. 111, 820 A.2d 197. Defendant carries the heavy burden of rebutting this presumption.

## A.

¶ 7. Under Vermont's bail statutes, if a district court determines that a defendant's personal recognizance or unsecured appearance bond is insufficient to assure appearance at trial, the court may impose "the least restrictive combination" of various enumerated conditions that will "reasonably assure ... appearance." 13 V.S.A. § 7554(a)(1). These conditions include placing the defendant in the custody of a designated individual, placing restrictions on travel, requiring "execution of a secured appearance bond" and requiring the defendant to post not more than 10% of the bond amount, and the execution of a surety bond with sufficient solvent sureties. *Id.* In 2002, the Legislature amended the statute to add another possible condition, permitting a court to "[r]equire the deposit with the clerk of court of cash bail in a specified amount." 2001, No. 124 (Adj. Sess.), § 2 (codified as most recently amended at 13 V.S.A. § 7554(a)(1)(F)). Thus, based on the plain language of the statute, the Legislature intended to provide courts with the option of requiring cash-only bail.

¶ 8. The distinction between a secured appearance bond and cash-only bail is significant from the standpoint of a defendant's liberty interests. In imposing cash-only bail, the district court in this case refused to consider the offered surety arrangement and required de-

---

[3] Section 40 provides three exceptions to this rule; none of the exceptions applies to this case.

[4] Our decision is limited to determining whether a requirement of cash-only bail is constitutional.

fendant to post the entire bail amount or be subject to pretrial confinement. By contrast, when a court requires only a secured appearance bond, a defendant can avoid pretrial confinement without posting cash or by posting a small percentage of the bail amount.

¶ 9. Both an appearance bond with sufficient sureties and cash-only bail serve the court's legitimate purpose of securing the defendant's appearance at trial. The posting of a secured bond fully protects the court's interest in having the defendant appear because the third party surety (a family member, friend, or commercial bail bondsman) has both a strong incentive to guarantee the defendant's appearance, and the ability to ensure appearance. If the defendant fails to appear, the surety must surrender the full bail amount to the court. Thus, defendant has a monetary incentive to comply with the court's orders to appear, whether the money will come from defendant himself or his surety.

## B.

¶ 10. The question before us is whether the provision enacted by the Legislature in 2002, allowing imposition of cash-only bail, is compatible with our Constitution's requirements concerning bail. We approach interpretation of the Constitution differently than we do the interpretation of statutes. *Chittenden Town Sch. Dist. v. Dep't of Educ.*, 169 Vt. 310, 326, 738 A.2d 539, 551 (1999). We have found an understanding of the constitutional provision's historical context to be a most helpful tool for determining the meaning of the provision, and we have often relied on that context to illuminate the meaning of our Constitution. See *Chittenden Town Sch. Dist.*, 169 Vt. at 328, 738 A.2d at 552; *Brigham v. State*, 166 Vt. 246, 257, 692 A.2d 384, 391 (1997); *State v. Wood*, 148 Vt. 479, 482, 536 A.2d 902, 904 (1987). The history of bail practices is particularly relevant to our inquiry today. That history indicates that constitutional bail provisions like § 40 serve not only to ensure a defendant's future appearance, but also to protect the defendant from pretrial detention by providing a measure of flexibility in satisfying the court that he will appear as required.

¶ 11. The concept of bail originated in medieval England, though its precise origins are uncertain. See P. Lermack, *The Law of Recognizances in Colonial Pennsylvania*, 50 Temp. L.Q. 475, 475-76 (1977) (suggesting that the earliest uses of bail might have been to ransom hostages captured in battle, to bribe jailors, or to circumvent incompetent jailors by shifting responsibility for appearance to private parties). The use of bail in England evolved out of necessity

when a shortage of traveling magistrates resulted in accused persons being jailed for a lengthy period before trial. *Id.* Bail enabled feudal sheriffs to release prisoners from local jails while they awaited trial, thus avoiding the costs of confinement while continuing to ensure appearance. Note, *Bail: An Ancient Practice Reexamined*, 70 Yale L.J. 966, 966 (1961).

¶ 12. In addition, bail developed "as a pretrial complement to a system of money fines or 'bots' designed to compensate private grievances." J. Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail*, 34 Syracuse L. Rev. 517, 519 (1983). This system allowed the accused to be released into the custody of a personal surety who would then be responsible for the accused's appearance at trial. A personal surety was responsible for "guarantee[ing] both the appearance of the accused at trial *and* payment of the bot upon conviction." Carbone, *supra*, at 520; see also 2 N. Hollander, et al., Wharton's Criminal Procedure § 9:2, at 9-3 (14th ed. 2006) (if surety "could not produce the accused when demanded, that person would have to surrender himself as a substitute for the accused or hand over a specified amount of property or money"). Thus, the personal surety had a strong incentive to ensure the accused would appear. Carbone, *supra*, at 520.

¶ 13. The "bot" system gave way as England developed a criminal justice system in which corporal punishment replaced monetary fines for most criminal offenses. *Id.* at 521-22. That development restricted the availability of bail, since it became difficult to calculate what bail amount would prevent flight by a person faced with corporal punishment. *Id.* at 522. In addition, a continued shortage of traveling magistrates contributed to "growing delays between accusation and trial [thus] increas[ing] the importance of pretrial release and the opportunities for abuse and corruption." *Id.* To address these problems, the English Parliament enacted the Statute of Westminster in 1275, which attempted to standardize bail practices and provide for uniform administration. *Id.* at 523; Note, *Bail: An Ancient Practice Reexamined*, 70 Yale L.J. 966, 966 (1961).

¶ 14. The Statute of Westminster accompanied English colonists to America, but it did not survive long in the new world. Carbone, *supra*, at 529. The colonists dispensed with the complicated categories of bailable offenses in the English law, adopting much simpler and more liberal bail provisions. *Id.* at 530-31. The Quakers who founded Pennsylvania sought to de-emphasize the English common

law, remembering it as an "instrument of persecution" in England. Lermack, *supra*, at 477. Toward that end, Pennsylvania's founders granted a broader right to bail by adopting the Great Law of 1682, which provided that "all Prisoners shall be Bailable by Sufficient Sureties, unless for capital Offenses, where proof is evident or the presumption great." Carbone, *supra*, at 531. Thus, in stark contrast to the English common law, the Great Law of 1682 made nearly all persons "bailable"—that is, eligible for pretrial release under proper conditions, including the promise by a surety to guarantee the defendant's appearance. The language in the Great Law of 1682 was incorporated into the Pennsylvania Constitution of 1776, and the Vermont Constitution of 1777. Pa. Const. ch. ii, § 28 (1776); Vt. Const. ch. II, § 25 (1777).

¶ 15. American courts used the personal surety system until at least the nineteenth century, but as society evolved, it became increasingly difficult to find reliable people known by both the courts and the accused. As a result the personal surety system evolved into the commercial bondsman system that exists today. Hollander, *supra*, at 9-4. Nonetheless, the operative principle is the same: a surety facilitates the possibility of pretrial release, because he or she has a financial stake in making sure the defendant appears at trial.

## C.

¶ 16. This history demonstrates that "[b]ail acts as a reconciling mechanism to accomodate both the defendant's interest in pretrial liberty and society's interest in ensuring the defendant's presence at trial." D. Verrilli, Note, *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 329-30 (1982); see also *Bandy v. United States*, 81 S. Ct. 197, 197 (1960) (mem.) (noting that bail is device that reconciles the "right to freedom during trial and pending judicial review . . . with the possibility that the defendant may flee or hide himself"). In light of this history and the history of the "sufficient sureties" clause itself, it is apparent that clause is primarily aimed at protecting a defendant's liberty interest and, concomitantly, serving the court's interest in having the defendant appear at trial.

¶ 17. While we have not previously interpreted the meaning of the phrase "sufficient sureties," we have consistently held that § 40 precludes using bail for the purpose of detaining the accused (as opposed to ensuring his or her appearance). We have recognized that pretrial detention "undermines the presumption of innocence by

'depriv[ing] a defendant of a fundamental value, the right to liberty, without an adjudication of guilt.'" *State v. Sauve*, 159 Vt. 566, 573, 621 A.2d 1296, 1300 (1993) (quoting *State v. Duff*, 151 Vt. 433, 440, 563 A.2d 258, 263 (1989) (alteration in original)). "Our constitutional values require that liberty is and must remain the norm . . . ." *Id.* at 573, 621 A.2d at 1300-01; see also *State v. Mecier*, 136 Vt. 336, 338, 388 A.2d 435, 437 (1978) (holding that § 40 precludes preventive detention); *State v. Cyr*, 134 Vt. 460, 462, 365 A.2d 969, 971 (1976) (holding that bail cannot be used solely as a device for protecting the public). The bail statutes themselves assume that a defendant will be released on personal recognizance or an unsecured appearance bond unless a finding is made that such measures will be insufficient. Our interpretation of the "sufficient sureties" clause should be consistent with our longstanding recognition that bail cannot be used for the purpose of pretrial detention. To construe the "sufficient sureties" clause as permitting cash-only bail would increase government power to engage in pretrial confinement, a result which cannot be reconciled with the history of the "sufficient sureties" clause or our own cases discussing bail, in which we have recognized the threat to individual liberty inherent in pretrial detention.

### D.

¶ 18. Courts in other jurisdictions with constitutional bail provisions similar to § 40 have reached differing conclusions on the constitutionality of cash-only bail. Some have construed their constitutions to permit cash-only bail. See, e.g., *Ex parte Singleton*, 902 So. 2d 132 (Ala. Crim. App. 2004); *Fragoso v. Fell*, 111 P.3d 1027 (Ariz. Ct. App. 2005); *State v. Briggs*, 666 N.W.2d 573 (Iowa 2003). Others have held that cash-only bail violates their respective "sufficient sureties" clauses. See, e.g., *State v. Brooks*, 604 N.W.2d 345 (Minn. 2000); *State v. Rodriguez*, 628 P.2d 280 (Mont. 1981); *Smith v. Leis*, 106 Ohio St. 3d 309, 2005-Ohio-5125, 835 N.E.2d 5; *Lewis Bail Bond Co. v. Gen. Sessions Court of Madison County*, 1997 WL 711137 (Tenn. Ct. App., Nov. 12, 1997). We are persuaded by the latter line of cases.

¶ 19. For example, in the context of examining the history of bail practices, the Minnesota Supreme Court held that Article 1, § 7 of the Minnesota Constitution, which provides, "[a]ll persons before conviction shall be bailable by sufficient sureties," precluded imposition of cash-only bail. *Brooks*, 604 N.W.2d at 350. In so holding, the court emphasized that the "broader purpose" of the "sufficient

sureties" clause is to limit "government power to detain an accused prior to trial." *Id.* The court noted that the term "surety," when interpreted in light of its definition, its "historical usage," Minnesota case law, and the decisions of other courts, encompassed a broad array of options and forms of security. *Id.* at 352-53. Therefore, it was improper to interpret the constitutional bail clause as allowing the court to limit an accused to cash-only bail. *Id.*

¶ 20. Similarly, in *State ex rel. Jones v. Hendon*, 609 N.E.2d 541 (Ohio 1993), the Supreme Court of Ohio held that cash-only bail violates the Ohio Constitution, which, like the Vermont Constitution, states that "[a]ll persons shall be bailable by sufficient sureties." Ohio Const. art. I, § 9. The court reasoned that "the only apparent purpose in requiring a 'cash only' bond to the exclusion of . . . other forms . . . is to restrict the accused's access to a surety and, thus, to detain the accused in violation of Section 9, Article I." *Jones*, 609 N.E.2d at 544. Following its decision in *Jones*, the Supreme Court of Ohio was called upon to interpret § 9 again after a constitutional amendment which explicitly recognized the discretion enjoyed by the trial courts in setting bail. Specifically, the 1998 amendment provided that "[w]here a person is charged with any offense for which the person may be incarcerated, the court may determine at any time the type, amount, and conditions of bail." Ohio Const. art. I, § 9. Even in the face of that provision, however, the court concluded "that the Ohio constitution still prohibits cash-only bail," reasoning that, even when the trial court's discretion is constitutionally recognized, such discretion cannot "violate an accused's access to a surety." *Smith*, 2005-Ohio-5125, ¶¶ 58-60.

¶ 21. We are not persuaded by the reasoning of those courts that have permitted cash-only bail. For example, in *Briggs*, the Iowa Supreme Court analyzed Iowa's constitutional provision: "[a]ll persons shall, before conviction, be bailable, by sufficient sureties, except for capital offences where the proof is evident, or the presumption great." Iowa Const. art. 1, § 12. *Briggs*, 666 N.W.2d at 583-84. In concluding that cash-only bail was permissible, the court asked whether "the sufficient sureties clause extends an unfettered right to . . . commercial bail bondsmen," drawing a distinction between that role and the function of "traditional form[s] of surety." *Id.* at 583. In so doing, *Briggs* gave short shrift to the role of bail via a surety in preventing excesses in pretrial confinement. See J. Buro, Note, *Bail—Defining Sufficient Sureties: The Constitutionality of Cash-Only Bail. State v. Briggs, 666 N.W.2d 573 (Iowa 2003)*, 35 Rutgers

L.J. 1407, 1408 (2004) (concluding that the *Briggs* court failed to "give substantial weight to the historical development of bail").[5] In *Fragoso*, another case permitting cash-only bail, the Arizona Court of Appeals wrote: "As article II [of the Arizona Constitution] now makes clear, the primary, if not paramount, purpose of bail under the Arizona Constitution is to guarantee a defendant's appearance in court while protecting victims, witnesses, and the public." 111 P.3d at 1034. Unlike Arizona's Constitution, our Constitution makes clear that a defendant, who is after all presumed innocent, has liberty interests that must be balanced against the court's interest in securing his or her appearance.

### III.

¶ 22. Our Constitution provides that "[a]ll persons shall be bailable by sufficient sureties." Vt. Const. ch. II, § 40. To permit imposition of cash-only bail would impermissibly restrict an accused's ability to negotiate with a surety to avoid pretrial confinement upon a promise of appearance. When viewed in its historical context, it is apparent that the term "surety" in Vermont's Constitution refers to a third party who guarantees the accused's appearance in exchange for accepting the substantial financial obligation that will be imposed should the accused fail to appear. Thus, the intervention of a surety is a critical mechanism for protecting the rights of the accused as well as the interests of the courts.

¶ 23. Denying a defendant the right to be bailable by sufficient surety ignores the need to reconcile the "right to freedom during trial and pending judicial review" with the legitimate interest of having defendant appear, and violates the person's rights under our Constitution. *Bandy*, 81 S. Ct at 197. In a case such as this one, the imposition of cash-only bail is, in effect, a denial of bail under circumstances that are not constitutionally permissible.

■ ¶ 24. This decision should not be understood to deny the trial judge, who oversees the bail process, the discretion to determine the sufficiency of the surety arrangements. As we held in *State v.*

---

[5] The decision is internally confusing as well. At one point, the court states "if the accused shows that the bail determination absolutely bars his or her utilization of a surety of some form, a court is constitutionally bound to accommodate the accused's predicament." *Briggs*, 666 N.W.2d at 583. It is difficult to reconcile this statement with the court's ultimate holding.

*Roessell*, "the option of 'a bail bond with sufficient solvent sureties, or the deposit of cash in lieu thereof', 13 V.S.A. § 7554(a)(4), is an option belonging to the defendant, and the court setting bail may not make that choice except as with regard to the sufficiency of the sureties." 132 Vt. 634, 636, 328 A.2d 118, 119 (1974). If the sureties proposed are not sufficient, not actually available, not adequately guaranteed, or are in any other way deficient, the court can reject them. They must be sufficient to accomplish the court's legitimate goal of ensuring the defendant's appearance.

¶ 25. To the extent 13 V.S.A. § 7554(a)(1)(F) permits imposition of a cash-only bond, it is unconstitutional. Accordingly, we reverse the decision of the district court and remand this matter for further proceedings consistent with this opinion.

*Reversed and remanded. Defendant shall remain in custody pending the court's reconsideration of his remanded motion for bail review.*